## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AIS FUTURES MANAGEMENT, LLC, and AIS CAPITAL MANAGEMENT , LLC, on behalf of themselves and all others similarly situated, | ) ) ) ) Case No. _____ |
| Plaintiffs, | ) ) **CLASS ACTION COMPLAINT** ) |
| vs. | ) ) **JURY TRIAL DEMANDED** |
| JPMORGAN CHASE & CO., J.P. MORGAN CLEARING CORP., J.P. MORGAN SECURITIES INC., J.P. MORGAN FUTURES INC., HSBC HOLDINGS PLC, HSBC SECURITIES (USA) INC., and HSBC BANK USA, NATIONAL ASSOCIATION. | ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

Plaintiffs AIS Futures Management, LLC, and AIS Capital Management, LLC on behalf

of themselves and all others similarly situated, brings this action against JPMorgan Chase & Co.,

J.P. Morgan Clearing Corp., J.P. Morgan Securities Inc., J.P. Morgan Futures Inc. (collectively

"JPMorgan"); HSBC Holdings PLC, HSBC Securities (USA) Inc., and HSBC Bank USA,

National Association (collectively "HSBC")   (together with JPMorgan, collectively

"Defendants") and alleges as follows.

### NATURE OF CLAIM

1.     This action arises from a conspiracy among Defendants to intentionally and

unlawfully suppress and manipulate the price of silver exchanged through futures contracts and

options on futures contracts (collectively, "derivatives") sold or traded on Commodity Exchange,

Inc. ("COMEX") between March 16, 2008 and the present, in violation of Section 22(a)(1) of the

Commodity Exchange Act ("CEA") (7 U.S.C. § 25(a)(1)) and Section 1 of the Sherman Act (15 U.S.C. § 1).

2.      On October 26, 2010, Commodity Futures Trading Commission ("CFTC") Commissioner Bart Chilton announced that there have been "violations of the Commodity Exchange Act in the silver market."  Specifically, Commissioner Chilton concluded that "[t]here have been fraudulent efforts to persuade and deviously control" prices in the silver market, which "should be prosecuted."  Commissioner Chilton indicated that the CFTC's investigation into manipulation in the silver market – which has been ongoing since September of 2008 – was continuing and added that he was "hopeful that the agency will speak publicly about the investigation in the very near future."

3.      The investigation is far-ranging, with federal law enforcement officials investigating, among other things, JPMorgan and others' COMEX trades in silver futures and options contracts as well as its trades on the London Bullion Market Association's Exchange, which is the physical delivery market for silver.  An investigation is also being conducted by the Antitrust Division of the Department of Justice ("DOJ").

4.      Prior to Commissioner Chilton's announcement, the CFTC had received numerous letters, e-mails and telephone calls alleging that silver derivatives prices were being unlawfully manipulated downward.  This included information from a whistleblower that has since been made public.  The whistleblower, Andrew Maguire, a metals trader who was working for Goldman Sachs in London, reported that he was told first-hand by metals traders working for JPMorgan about how the silver market manipulation complained of herein was carried out.  The metals traders bragged to Mr. Maguire about how they made money through this scheme.

5.      Using this knowledge, Mr. Maguire was able to explain the scheme to the CFTC and to successfully predict instances of coordinated market manipulation for the CFTC.

6.      As described by Mr. Maguire, and as alleged herein, Defendants conspired to and did suppress and manipulate the price of silver exchanged through COMEX silver derivatives.

7.      COMEX silver derivatives have two "sides."  The "long" side represents the buyer of a contract who is obligated to pay for silver at a specified price and to take delivery of it at a specified time.  The "short" side represents the seller of a contract who is obligated to deliver silver at the specified time at the specified price.  By fixing the price of silver at a future date in a derivatives contract, the buyer bets that the price of silver will increase by the time delivery is taken, thus securing silver at a lower price than available at the time of delivery.  The seller, on the other hand, bets that the price of silver will have decreased at the time of delivery, thus realizing the gains from the higher contract price.

8.      Throughout the Class Period, Defendants took out massive short positions on COMEX silver derivatives, betting that the price of silver would decrease.  However, as described by Mr. Maguire, Defendants guaranteed their bets by utilizing their dominant and heavily concentrated positions in those products, and as well as by making trades in physical silver, to suppress and manipulate the price of silver in their favor.

9.      By selling large blocks of silver derivatives or physical metal at opportune moments (such as closely following news that would otherwise move the price of silver higher), Defendants were able to suppress and manipulate the price of silver exchanged through COMEX silver derivatives, ensuring that they consistently realized the benefit of their short positions at the expense of those who purchased the derivatives.

10.     This scheme was implemented through Defendants' collusive conduct. Defendants used signals to notify each other and other traders privy to the scheme in advance of price manipulation.  These practices ensured the maximum possible participation in each attempt at price manipulation, thus guaranteeing its success.

11.     Defendants' manipulative and anticompetitive trading activity directly caused and resulted in the intentional unlawful manipulation and suppression of the price of silver exchanged through COMEX silver derivatives during the Class Period.

12.     In March 2010, Mr. Maguire publicly disclosed his communications with the CFTC and released his e-mails predicting the market suppression of COMEX silver derivatives. Defendants thereafter began to slowly unwind their massive short positions, although those positions still remain substantial.  As reflected in the CFTC Bank Participation reports[1], the net short position of silver derivatives held by commercial banks has been reduced by more than 30% since March of 2010.  As Defendants' short positions in COMEX silver derivatives have decreased, the price of silver has risen dramatically.  Silver has gained 40% this year, touching $24.95 an ounce on October 14, its highest level in 30 years.

---

[1]     The CFTC Bank Participation Reports provide statistical data on the number of COMEX silver derivatives and relative positions taken by United States and foreign banks. Until November of 2009, the CFTC Bank Participation Reports provided the number of United States and foreign banks that traded in COMEX silver derivatives for a given month.  Pursuant to applicable commodities law, which prohibits the CFTC from disclosing the identity and positions of commodity traders to the public, the CFTC Bank Participation Reports do not reveal the names of the banks that trade in COMEX silver futures contracts. There is, however, another report, the "Bank Derivatives Activities Report", which is compiled by the Office of the Comptroller of the Currency. In this report they list the top five banks by name who own the most OTC derivatives in the separate categories of gold derivatives and precious metals derivatives, the latter of which consists primarily of silver. In November of 2009, the CFTC decided to stop publishing the number of commercial banks for markets, such as COMEX silver futures contracts, where fewer than five banks participate.

13.     As a result of their unlawful and manipulative scheme, Defendants reaped hundreds of millions, if not billions, of dollars in profits. As more fully alleged herein, Plaintiffs and members of the Class suffered damages by trading COMEX silver derivatives subject to manipulated and artificially-suppressed silver prices during the Class Period.

14.     Defendants' conspiracy violates Section 22 of the CEA (7 U.S.C. §25) and Section 1 of the Sherman Act (15 U.S.C. § 1).

15.     Defendants made use of the means and instrumentalities of transportation or communication in, or the instrumentalities of, interstate commerce, or of the mails in connection with the unlawful acts and practices and courses of business alleged in this Complaint.

## JURISDICTION AND VENUE

16.     This action arises under Section 1 of the Sherman Act (15 U.S.C., § 1), Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26), and Section 22 of the CEA (7 U.S.C. § 25).

17.     This Court has jurisdiction under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a) and 26), Section 22 of the CEA (7 U.S.C. 25), and 28 U.S.C. §§ 1331 and 1337.

18.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a), pursuant to Section 22 of the CEA (7 U.S.C. § 25), and 28 U.S.C. § 1391(b), (c) and (d).  Defendants resided, transacted business, were found, or had agents in the District and/or the claims arose at least in part in the District.

## PARTIES

19.     Plaintiff AIS Futures Management, LLC ("AIS Futures") is a Delaware Limited Liability Company with its principal place of business in Wilton, Connecticut.  AIS Futures has been continuously registered with the CFTC as a Commodity Pool Operator since May 14, 1990 and as a Commodity Trading Advisor since August 20, 1992, and has been a member of the

National Futures Association in such capacities since that date. AIS Futures operates multiple futures funds valued at tens of millions of dollars. During the Class Period, Plaintiffs traded COMEX silver derivatives – investing a significant proportion of its various funds in silver derivatives and consistently taking long positions – and was injured as a result of Defendants' anticompetitive acts and market manipulation.

20.     AIS Futures trades derivatives pursuant to a multi-asset investment program called the Multi Asset Allocation Portfolio ("MAAP"). MAAP allocates approximately 1/6 of the portfolio's potential total contract value (when fully invested) to each of the following six asset classes: equities, fixed income, currency, metals, agricultural products, energy products. Within each of the three physical commodity asset classes, while still allocating 1/6 to each asset class, AIS trades several markets that at times have a high degree of correlation. So, within the 1/6 "metals" allocation, gold futures generally represent the largest potential position, but the portfolio also generally includes positions in silver and copper futures. A significant proportion of funds are, therefore, invested in silver derivatives.

21.     Plaintiff AIS Capital Management, LLC ("AIS Capital") is a Delaware Limited Liability Company with its principal place of business in Wilton, Connecticut. AIS Capital has been continuously registered with the CFTC as a Commodity Pool Operator since September 10, 1993, and has been a member of the National Futures Association in such capacity since that date.

22.     AIS Capital trades pursuant to three different strategies (1) Gold Strategy; (2) Tactical Asset Allocation Portfolio ("TAAP") and (3) Capital Growth strategies. The Gold Strategy includes investment in silver equities – such as mining companies – and derivatives. It

6

takes both long and short positions in those equities and derivatives with exposure ranging from 300% net long to 100% net short.  The TAAP is a long-only portfolio with the primary goal of protecting capital, and a secondary goal of capital appreciation.  It invests, in part, in gold and other precious metals derivatives.

23.    Defendant JPMorgan Chase & Co. ("JPMCC") is a Delaware financial holding company with its principal place of business in New York, New York.  JPMCC is a leading global financial services firm and one of the largest banking institutions in the United States with $2.1 trillion in assets, $164.7 billion in stockholders' equity, and operations in more than 60 countries.

24.    Defendant J.P. Morgan Clearing Corp. ("JPMC"), formerly known as Bear Stearns Securities Corp. is a Delaware corporation with its corporate offices in Brooklyn, New York.  JPMC is a subsidiary of J.P. Morgan Securities Inc. which is a wholly owned subsidiary of JPMorgan Chase & Co.  JPMC is a registered Futures Commission Merchant with the CFTC.

25.    Defendant J.P. Morgan Securities Inc. ("JPMS") is a Delaware corporation with its principal place of business in New York, New York.  JPMS is a wholly owned subsidiary of JPMorgan Chase & Co.  JPMS, through JPMC, provides securities and futures clearing, customer financing, securities lending and related services.

26.    Defendant J.P. Morgan Futures Inc. ("JPMFI") is a Delaware corporation with its principal place of business in New York, New York.  JPMFI is a U.S. futures commission merchant and wholly owned subsidiary of JPMorgan Chase & Co.  JPMFI provides research, sales, execution and clearing services in derivatives across fixed income, equity, foreign

exchange and commodity asset classes.  JPMFI holds the U.S. accounts of JPMorgan Chase's global derivatives business customers.

27.     JPMCC, JPMC, JPMS and JPMFI are referred to collectively. herein as "JP Morgan."

28.     Defendant HSBC Holdings plc ("HSBC Holdings") is a United Kingdom public limited company with its corporate headquarters in London, England and with its principal office in the United States in New York.  As of 2009, HSBC Holdings was the world's largest banking group and the world's sixth largest company according to Forbes Magazine.

29.     Defendant HSBC Securities (USA) Inc. ("HSBC USA") is a Delaware corporation with a corporate office located in New York, New York.  HSBC USA is a wholly owned subsidiary of HSBC Markets (USA) Inc. whose ultimate parent is HSBC Holdings plc. HSBC USA is a registered broker-dealer of securities under the Securities Exchange Act of 1934 and is a registered Futures Commission Merchant with the CFTC.

30.     Defendant HSBC Bank USA, National Association ("HSBC NA") is a Texas company its principal office in Brooklyn, New York.

31.     Defendants HSBC Holdings, HSBC USA, and HSBC NA are referred to collectively herein as "HSBC."

32.     Whenever in this Complaint reference is made to any act, deed or transaction of any corporation, the allegation means that the corporation engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

33.     The conduct alleged herein was carried out by Defendants' officers, agents, employees, or representatives, while engaged in the usual management of Defendants' business.

34.     Defendants are also liable for acts done in furtherance of the alleged conspiracy by companies they acquired through mergers and acquisitions.

35.     When Plaintiffs refer to a corporate family or companies by a single name in their allegations of participation in the conspiracy, it is to be understood that the Plaintiffs are alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial acts on behalf of every company in that family. The individual participants entered into agreements on behalf of their respective corporate families. As a result, the entire corporate family was represented by their agents with respect to such conduct and was a party to the agreements reached by such agents.

36.     Each of the Defendants named herein acted as the agent of, co-conspirator with, or joint venturer of the other Defendants and Co-conspirators with respect to the acts, violations and common course of conduct alleged herein.

## UNNAMED CO-CONSPIRATORS

37.     Various other entities and individuals not named as Defendants in this Complaint participated as co-conspirators in the acts complained of and performed acts and made statements which aided and abetted and was in furtherance of the unlawful conduct.

## THE RELEVANT MARKET

38.     The relevant market, which was the target of Defendants' anticompetitive and unlawful scheme, is COMEX silver derivatives.

## CLASS ACTION ALLEGATIONS

39.     Plaintiffs bring this action as a class action under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of himself and a class of others similarly situated. The "Class" is defined as:

All persons or entities other than Defendants and their employees, affiliates, parents, subsidiaries or co-conspirators (whether or not named in this Complaint) who transacted in COMEX silver derivatives between March 16, 2008 and the present.

40.     The Class is so numerous that joinder of all members is impracticable.  While the exact number of the Class members is unknown to Plaintiffs at this time, Plaintiffs are informed and believes that at least thousands of geographically dispersed Class members traded COMEX silver derivatives during the Class Period.

41.     Plaintiffs' claims are typical of the claims of the other members of the Class. Plaintiffs and members of the Class sustained damages arising out of Defendants' common course of conduct in violation of law as complained herein.  The injuries and damages of each member of the Class were directly caused by Defendants' wrongful conduct in violation of law as alleged herein.

42.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action litigation, including commodity manipulation and antitrust class action litigation.

43.     Common questions of law and fact exist as to all members of the Class which predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether Defendants conspired with others to artificially depress and manipulate the price of COMEX silver derivatives in violation of the Sherman Act;

(b)     Whether Defendants' conduct, which manipulated and suppressed the prices of COMEX silver derivatives, violates the CEA;

10

(c)    Whether Defendants' conduct had an anticompetitive and manipulative effect on the prices of COMEX silver derivatives purchased or sold by Plaintiffs and the Class during the Class Period; and

(d)    The appropriate measure of damages, under the CEA and federal antitrust laws, sustained by Plaintiffs and other members of the Class as a result of Defendants' unlawful activities.

44.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable. The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and Defendants, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action, on the other hand, would achieve substantial economies of time, effort and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

45.    The interest of members of the Class in individually controlling the prosecution of separate actions is theoretical rather than practical. The Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable. The amounts at stake for Class members, while substantial in the aggregate, are not great enough individually to enable them to maintain separate suits against Defendants. Plaintiffs do not anticipate any difficulty in the management of this action as a class action.

## FACTUAL ALLEGATIONS

I.   BACKGROUND

    A.   **Overview of COMEX**

46.   Silver derivatives are traded on COMEX.

47.   COMEX is an organized, centralized market that provides a forum for trading silver derivatives.

48.   COMEX was a division of the New York Mercantile Exchange ("NYMEX"). NYMEX is the world's largest physical commodity futures exchange, located in New York City. Its two principal divisions were the New York Mercantile Exchange and COMEX, which were once separate but are now part of the same company. The former parent company of NYMEX and COMEX, NYMEX Holdings, Inc. became listed on the New York Stock Exchange on November 17, 2006, under the ticker symbol NMX. On March 17, 2008, CME Group signed a definitive agreement to acquire NYMEX Holdings, Inc. for $11.2 billion in cash and stock and the takeover was completed in August of 2008. Both NYMEX and COMEX now operate as Designated Contract Markets ("DCM") of the CME Group pursuant to Section 5 of the CEA. 7 U.S.C. § 7.  COMEX submits to the CFTC various rules and regulations for approval through which COMEX designs, creates the terms of, and conducts trading in various precious metals derivatives, including futures and options contracts for silver.

49.   COMEX provides standardized silver derivatives contracts with possible delivery dates commencing with the next calendar month and extending as far as 60 sequential months into the future depending upon the month in which the contract was executed.  A silver derivative is an agreement to buy or sell a fixed amount of silver at a date in the future.  COMEX

specifies the terms of trading, including the trading units, price quotation, trading hours, trading months, minimum and maximum price fluctuations and margin requirements.

### B.   <u>COMEX Silver Futures and Options</u>

50.     Trades of silver derivatives on the COMEX have two "sides."  The "long" side represents the buyer of a contract who is obligated to pay for the silver and take delivery.  The "short" side represents the seller of a contract who is obligated to receive payment for the silver and make delivery.  If a market participant holds its position to the end of the settlement period for a silver futures contract, the market participant is obligated to "go to delivery."  That is to say, upon the settlement date, the "futures" contract for a particular month becomes a present contractual obligation for the purchase and sale of the physical silver.  Longs must take delivery and shorts must make delivery of 5,000 troy ounces per contract over the course of the contract month.  The price for the silver that goes to delivery is the "settlement price" of the COMEX silver futures contract.

51.     There are a number of ways to "go short."  One can sell a futures contract which confers upon the seller an obligation to deliver silver at a pre-specified date in the future at a pre-specified price.  Alternatively, one can sell call options, which confers upon the buyer of the call option the right, but not the obligation, to purchase silver from the seller at a pre-specified "strike price" at some date in the future ("expiry").  At expiry, if the price of silver exceeds the strike price, the buyer will exercise the option, which means the seller will pay the difference between the prevailing price and the strike price.  Conversely, if the price of silver falls short of the strike price, the option expires "out of the money."

52.     Only a small percentage of all futures contracts traded each year on COMEX and other exchanges result in actual delivery of the underlying commodities.  In some instances, contracts may be settled in cash.  But more frequently, traders "offset" their futures positions before their contracts mature by taking, in a new contract, an equal and opposite position to the position taken in the contract that is about to mature.  For example, a purchaser of a silver futures contract can cancel or offset his future obligation to take delivery of silver by selling a futures contract.  At that time, the futures price will reflect the price change in the underlying commodity and the difference between the initial purchase or sale price and the price of the offsetting transaction represents the realized profit or loss.

53.     During the Class Period, Defendants had net short positions in silver derivatives, including but not limited to, the sale of call options.  They, therefore, benefitted as silver prices fell.  Typically, where they sold a futures contract, Defendants, at time of contract expiration, would simply offset their positions by purchasing a new futures contract, thereby pocketing the difference in prices between the two futures contracts.  In the case of a call option, where the prevailing price was below the strike price, Defendants would benefit by collecting the option premium and paying nothing to the purchaser.

C.      **Physical and Futures Prices are Directly Related to One Another**

54.     The futures price is the market's consensus of the expected spot price for the underlying physical commodity at a specified future date.  Because the futures price is nothing more than an expectation of the future spot price, both futures and physical prices must be and are, in fact, correlated.  For example, if the futures price in a contract negotiated today for delivery next month starts to rise, this indicates that the market believes spot prices will rise next

14

month.  The rise in the future price for next month delivery will cause a reaction today among producers and consumers of the commodity.

55.     For the producers of the commodity, the increase in the price of that commodity for delivery next month makes it more profitable to shift sales from the current month to the next month.  Conversely, for buyers of physical silver, the increase in price for delivery next month creates an incentive for them to purchase today rather than waiting until next month when the price increase is expected.  Thus, the increase today in futures prices (for delivery next month) has caused producers to decrease the available supply of the commodity and prompted buyers of physical silver to increase their demand. The decrease in supply coupled with the increase in demand, causes today's spot prices for the commodity to increase.  The same causal economic story (albeit in reverse) prevails if futures prices decline.

56.     Therefore, changes in futures prices for delivery months into the future have tangible effects on physical spot prices today, and *vice versa*.  Put statistically, futures prices and physical spot prices are linked and correlated.

###      D.      The Silver Futures Market is Highly Susceptible to Manipulation

57.     The silver derivatives market is considered "thin" because the number of derivatives contracts traded in the silver market is small in comparison to markets involving other commodities.  For instance, in August 2008, there were only 129,240 open interest silver futures contracts – silver futures contracts that had not yet settled – as opposed to 1.25 million open interest NYMEX Light Sweet Crude Oil futures contracts and 408,430 open interest COMEX gold futures contracts during the same period.

58.     In addition, the markets for silver and other precious metal derivatives are highly concentrated.  In 2009, for example, four banks – JPMorgan, Citigroup, Bank of America and Goldman Sachs – controlled over 90% of the United States derivatives market.  Similarly, in 2009 HSBC NA held 40% of all precious metals derivatives (excluding gold) held by commercial banks.

59.     COMEX silver derivatives became particularly concentrated during the Class Period, with JPMorgan and HSBC becoming the substantially dominant players.  This concentration began following the March 2008 acquisition of Bear Stearns Companies, Inc. ("Bear Stearns") by JPMorgan.  Bear Stearns had amassed a significant short position in COMEX silver futures and options.

60.     This combination of a thin market and high concentration makes the silver futures market highly susceptible to price manipulation.  Dominant players in thin markets can manipulate price by flooding the market with a disproportionate number of contracts.  As physical and futures prices are correlated, it is possible for dominant players in commodities derivatives to manipulate to their benefit both the market for the derivative products and the price of the commodity underlying those products.  Defendants did just this in the COMEX silver futures and options market during the Class Period.

61.     As Mark Epstein, one prominent silver trader, noted in written testimony provided to the CFTC as part of its March 25, 2010 public meeting to examine derivatives trading in the metals market, explained:

> In studying the micro-price movement personality of the COMEX silver market, I can tell you that it behaves like no other market. The typical available liquidity in the deck is tiny, yet we have average daily volume in excess of 40,000 contracts. And as a

16

result, there is significant price volatility for the market to absorb large orders. The existence of oversized market participants has a chilling effect on market makers, which results in even less liquidity as market makers widen their prices to compensate for the increased risks they are taking. Consequently, the large orders wind up setting prices, rather than the proper function of the futures markets to discover prices.

## II.    DEFENDANTS SUPPRESSED AND MANIPULATED THE PRICE OF SILVER EXCHANGED THROUGH COMEX SILVER FUTURES AND OPTIONS CONTRACTS.

### A.    <u>Upon JPMorgan's Acquisition of Bear Sterns, Defendants Aggressively Expanded Their Short Positions Enabling Them to Manipulate the COMEX Silver Market.</u>

62.    After the Bear Stearns acquisition, and in stark contrast to their prior conduct, Defendants significantly increased their short positions.

63.    The manipulation described by Mr. Maguire and detailed further herein had been going on since the spring of 2008.  At the March 25, 2010 CFTC meeting, Harvey Organ, who publishes a daily gold and silver report,  testified as follows:

The Bank Participation Report of August 2008, a report which the BIS [Bank of International Settlements] uses to gauge risks to banks, revealed that one or two USA banks held a massive short position in silver of some 33,805 contracts or 169 million ozs of silver. In the July Bank Participation Report, these same two banks, held a short position of 6,199 contracts or 31 Million ozs. The increase in silver short was an astonishing 138 million ozs of silver.

****

All mining activity throughout the world produces 680 million oz annually. This increase in the silver short represents 20% of all mine production. With respect to the total short position of 169 million oz, this represents 25% of all annual mine production of silver. To my knowledge, this is the largest concentration of a short position in any commodity.

64.     Between July and November of 2008, JPMorgan and HSBS went from having just 9% of the total commercial net short position to having 99%.  They had effectively cornered the market.

65.     The effect of this manipulation by JP Morgan and HSBC caused silver prices to crash.  On March 17, 2008, silver was trading at $21.14 per ounce. By October 27, 2008, it was trading at $8.40 per ounce.

66.     This is well illustrated by the following chart, which shows how a precipitous drop-off in the price of silver closely tracked Defendants' aggressive cornering of silver short positions on COMEX from July to November of 2008:

**SILVER PRICE AND DEFENDANTS' NET SHORT**
**AS PERCENT OF COMMERCIAL NET SHORT**



67.     As the following chart compiled by Sidney Sherrod, Acting Director of

Surveillance for the CFTC, indicates, Defendants consistently maintained their massive short

positions throughout the Class Period.



68.     The CFTC's own reports further indicate that, as of November of 2009, two banks

– JPMorgan and HSBC – held 68% of the commercial net short position in silver. In silver, these

Defendants were short 41,318 contracts and long on only 1,426 contracts. During the last three

months of 2009, JPMorgan alone increased its silver derivatives holdings by $6.76 billion, or

about 220 million ounces.

69.     This stands in stark contrast to foreign banks whose short positions in COMEX,

silver derivatives have been consistently less than 5% of open interest in these positions, as

reflected in a second chart compiled by Mr. Sherrod:



70.     Throughout the Class Period, therefore, Defendants maintained a level of market

dominance that enabled them to manipulate the silver market to ensure that their short positions

remained profitable at the expense of those who purchased COMEX futures and options

contracts.  Indeed, Defendants' concentrated short position in silver derivatives far exceeded that

of the notorious Hunt Brothers who settled charges with the CFTC stemming from their

manipulation of the silver market.[2]

_____

            [2]     In the 1970s, Nelson Bunker Hunt and William Herbert Hunt, two heirs to an oil
fortune, attempted to corner the silver market, eventually accumulating long positions in almost

71.     By taking such an aggressive coordinated short position and so dramatically increasing the supply of COMEX silver derivatives, Defendants were thus in a position to circumvent market pressures, leaving them free to manipulate silver pricing as desired.  This position held until Defendants' unlawful conduct was made public, at which point they began to slowly unwind their short positions, although their positions still remain very substantial.

**B.     Defendants' Conspiracy to Manipulate the Price of COMEX Silver Futures Contracts and Options is Uncovered During a CFTC Investigation.**

72.     As noted above, the CFTC launched an investigation into manipulation in the silver market in September of 2008 after it had received "numerous letters, e-mails and phone calls" alleging that silver futures prices were being manipulated downward.

73.     In November of 2009, Andrew Maguire, a metals trader who had been working for Goldman Sachs in London, contacted the CFTC Enforcement Division and reported Defendants' illegal conspiracy to manipulate and suppress the prices of COMEX silver derivatives.

74.     On January 26, 2010 Mr. Maguire contacted Eliud Ramirez, Senior Investigator for the CFTC's Enforcement Division, by e-mail, calling the agency's attention to silver trading that day.  As in his other e-mails, Mr. Maguire copied Commissioner Bart Chilton and Chairman Gary Gensler of the CFTC. Mr. Maguire noted that that day's trading was a "good example of how a single seller, when they hold such a concentrated position in a very small silver market, can instigate a selloff at will."  Mr. Maguire highlighted the fact that sell-off events occur on a

---

10 percent of the known world supply of silver.  In 1985, the Hunt Brothers were charged by the CFTC with manipulating and attempting to manipulate the prices of silver futures contracts and silver bullion during 1979 and 1980.  The brothers eventually settled with the CFTC and filed for bankruptcy.  In August of 1988, a federal jury awarded Minpeco, S.A. a Peruvian mining company, $132 million against the Hunt brothers, finding that they had violated the antitrust laws and the CEA.

monthly basis on or around the dates of certain key events, including: (a) following the United

States Department of Labor's issuance of Non-Farm Payroll Reports[3], which are released during

the first week of each month; (b) at the time of Options Expiry[4] on the last four business days of

each month; and (c) during COMEX silver futures contract roll-overs.  In his words, such

coordinated sell-off events "trade to a regular pattern and we see orchestrated selling occur 100%

of the time at options expiry, contract rollover, non-farm payrolls (no matter if the news is

bullish or bearish), and in a lesser way at the daily silver fix."

        75.    Furthermore, in his e-mail, Mr. Maguire indicated that these "orchestrated"

actions are started by signals sent by one participant, after which all participants in the

conspiracy move as if they were a "single trading entity."

        76.    Describing the "daily fix," Mr. Maguire highlighted that during certain times of

the day (typically when trading volume on the COMEX is light), Defendants rapidly dumped

large numbers of COMEX silver derivatives at or around the same suppressed price.  It was

understood among Defendants and their co-conspirators that the price of these contracts would

set the direction of silver futures prices for that day:

            As an example, if you look at the trades just before the pit open
            today you will see around 1,500 contracts sell at once where the

---

        [3]     The Non-farm Payroll Report is an influential statistic and economic indicator
released monthly by the United States Department of Labor as part of a comprehensive report on
the state of the labor market.
        [4]     The expiration date of an options contract, a.k.a., Options Expiry, is the day on
which an options contract is no longer valid and, therefore, ceases to exist.  Because Defendants
held net short positions in silver options contracts, Defendants profited by driving down the price
of silver traded through COMEX silver derivatives.  Indeed, by depressing the price of silver
exchanged through COMEX silver derivatives, Defendants assured themselves that the long
options contracts opposite their positions would expire out of the money.  Since the options
expired worthless, traders who owned the positions opposite to Defendants did not exercise their
options and Defendants reaped a profit.

22

bids were tiny by comparison in the fives and tens.  This has the
immediate effect of gaining $2,500 per contract on the short
positions against the long holders, who lose that in moments and
likely were stopped out.  Perhaps look for yourselves into who was
behind the trades at that time and note that within that 10-minute
period 2,800 contracts hit all the bids to overcome them.  This is
hardly how a normal trader gets the best price when selling a
commodity . . . This kind of trading can occur only when a market
is being controlled by a single trading entity . . . It is my wish just
to bring more information to your attention to assist you in putting
a stop to this criminal activity

77.     Mr. Maguire's statements concerning the "daily fix" are corroborated by Jeffrey

Christian, Managing Director and founder of CPM Group, a commodities research and

consulting company in New York.  Christian provided written testimony to the CFTC as part of

its aforementioned March 25, 2010 hearing, stating that "there are times when companies enter

the market with large trades during the New York pre-market, apparently with the intention of

moving prices in their favor by placing a large order or orders before the liquidity is there to

accommodate such trades."

78.     In a subsequent e-mail to Mr. Ramirez, dated February 3, 2010, Mr. Maguire

informed the agency that he had received a signal from Defendants indicating their intent to

depress the prices of COMEX silver derivatives two days later, at or around the time of the

announcement of the Non-Farm Payroll Report.  He then predicted how the manipulation would

play out:

Scenario 1.  The news is bad (employment is worse).  This will
have a bullish effect on gold and silver as the U.S. dollar weakens
and the precious metals draw bids, spiking them higher.  This will
be sold into within a very short time (1-5 mins) with thousands of
new short contracts being added, overcoming any new bids and
spiking the precious metals down hard, targeting key support
levels.

Scenario 2.  The news is good (employment is better than expected).  This will result in a massive short position being instigated almost immediately with no move up.  This will not initially be liquidation of long positions but will result in stops being triggered, again targeting key support levels.

Both scenarios will spell an attempt by the two main short holders [Defendants] to illegally drive the market down and reap very large profits.  Locals such as myself will be "invited" on board which will further add downward pressure.

****

Only if a market is manipulated could this possibly occur.

79.     As the chart below illustrates, the price of silver then fell dramatically, just as Mr.

Maguire had predicted it would because of Defendants' market manipulation:



80.     On February 5, 2010, Mr. Maguire e-mailed Ramirez again, saying:

A final e-mail to confirm that the silver manipulation was a great success and played out EXACTLY to plan as predicted yesterday. How would this be possible if the silver market was not in the full

24

control of the parties we discussed in our phone interview? I have honored my commitment not to publicize our discussions.

I hope you took note of how and who added the short sales (I certainly have a copy) and I am certain you will find it is the same concentrated shorts who have been in full control since JPM took over the Bear Stearns position.

It is common knowledge here in London among the metals traders that it is JPM's intent to flush out and cover as many shorts as possible prior to any discussion in March about position limits. I feel sorry for all those not in this loop. A serious amount of money was made and lost today and in my opinion as a result of the CFTC's allowing by your own definition an illegal concentrated and manipulative position to continue.

81.     In March of 2010, Mr. Maguire went public with his allegations and revealed his e-mails to the CFTC predicting certain market movements.

82.     Defendants then slowly began to unwind their massive short positions shortly thereafter.  As reflected in the CFTC Bank Participation reports, the net short position of silver futures held by commercial banks, of which Defendants comprise the vast majority, has been reduced by more than 30% since March of 2010.  According to the most recent CFTC Commitment of Traders Reports, there are currently 56,048 short contracts (or 280.2 million ounces) held by commercial traders, primarily JP Morgan and HSBC.

83.     As the information about Defendants' market manipulation efforts dribbles out to the public, the contract price of silver has increased dramatically. While silver futures traded in the $17-$19.50 per ounce range in the spring and summer of 2010, starting on September 1, 2010, they climbed to the level of $24.95 per ounce in two months, the highest level in 30 years. The following chart posted on one analyst's website depicts what occurred during the Class Period:



84.     On October 26, 2010, CFTC Commissioner Bart Chilton announced that:

I believe that there have been repeated attempts to influence prices in the silver markets.  There have been fraudulent efforts to persuade and deviously control that price.  Based on what I have been told by members of the public, and reviewed in publicly available documents, I believe violations to the Commodity Exchange Act (CEA) have taken place in silver markets and that any such violation of the law in this regard should be prosecuted.

****

Thoughtful investigations take time.  The CFTC staff has worked extremely hard on the silver investigation.  That said, there is a point at which it is our responsibility to say something. Within the law, I have done so.  I am hopeful that the agency will speak publicly about the investigation in the very near future and when they do so that it will be in a more granular fashion than I am permitted from doing at this time.

26

85.     The agency's conduct reveals, however, that it has so far not taken any enforcement responsibility seriously with respect to Defendants' manipulation of the silver derivatives.  Mr. Ramirez of the CFTC did nothing in response to Mr. Maguire's e-mails, including doing nothing to prevent the February 5, 2010 market manipulation predicted by Mr. Maguire.  Mr. Ramirez did not even acknowledge Mr. Maguire's February 3 and 5, 2010 e-mails, a fact that Mr. Maguire noted in a follow-up e-mail to him dated February 9, 2010.  Nor was Mr. Maguire invited to speak at the CFTC's March 25, 2010 hearing mentioned above.  At this same hearing, Jeremy Charles of HSBC testified that the precious metals markets were operating properly and that there was no need for the federal government to impose speculative position limits for such metals.  No one from the CFTC challenged this testimony, despite Mr. Maguire's prior revelations to the agency of the ongoing manipulation by HSBC and JPMorgan of the silver futures and options market.

86.     This inaction is hardly surprising, given that the CFTC has a hidden policy of denying relief to victims of market fraud and manipulation.  Former CFTC Administrative Law Judge, George H. Painter, in a September 17, 2010 Notice and Order announcing his retirement, gave a glimpse into just how inadequate an enforcer the CFTC has historically been:

> There are two administrative law judges at the Commodity Futures Trading Commission:  myself and the Honorable Bruce Levine. On Judge Levine's first week on the job, nearly twenty years ago, he came into my office and stated that he had promised Wendy Gramm, then Chairwoman of the Commission, that we would never rule in a complainant's favor.  A review of his ruling will confirm that he had fulfilled his vow.  Judge Levine, in the cynical guise of enforcing the rules, forces *pro se* complainants to run a hostile procedural gauntlet until they lose hope, and either withdraw their complaint or settle for a pittance, regardless of the merits of the case.  *See* Michael Schroeder, *If You've Got a Beef With a Futures Broker, This Judge Isn't for You – In Eight Years at the CFTC,*

*Levine Has Never Ruled in Favor of and Investor*, Wall St. J., Dec.
13, 200, at A1.

87.     The CFTC's enforcement staff has, according to an October 27, 2010 article published in the *Wall Street Journal*, circulated a packet of information to CFTC lawyers and commissioners, outlining some of its findings in the silver probe, including documents that could suggest there have been attempts to manipulate prices.

88.     According to the same article, CFTC lawyers have interviewed employees of JPMorgan in its metals-trading business as well as industry traders, commodity executives, experts and employees of other metals-trading firms.

89.     The article also cites a CFTC weekly report for October 19, the most recent period, showing that less than four market players hold 24.3% of all net bearish bets in the silver market.  Importantly, relying on silver traders and a person close to the investigation, the article confirms that Defendants are among those market participants.

90.     Moreover, according to an article published in the *New York Post* the DOJ's Antitrust Division is conducting a criminal probe into the matter.

91.     According to that article, "[t]he probes are far-ranging, with federal officials looking into JP Morgan's precious metals trades on the London Bullion Market Association's (LBMA) exchange, which is a physical delivery market, and the New York Mercantile Exchange (NYMEX) for future paper derivative trades."

### C.     Other Market Factors Also Indicate a Conspiracy

92.     Various factors make the market for COMEX silver derivatives susceptible to a price fixing and market manipulation conspiracy.

i.     *Standardized Product with High Degree of Interchangeability*

93.     When products offered are viewed as interchangeable by market participants, it is easier to unlawfully agree on the price for the product in question, and it is easier to effectively monitor agreed-upon prices. This makes it easier to form and sustain an unlawful anticompetitive agreement or conspiracy.

94.     Here, COMEX silver derivatives are interchangeable.  Indeed, COMEX specifies the terms of each contract, including the trading units, price quotation, trading hours, trading months, minimum and maximum price fluctuations and margin requirements.

ii.     *Defendants Had a Motive to Manipulate the Price of COMEX Silver Futures and Options Contracts*

95.     Defendants specifically intended to manipulate the price of silver exchanged through COMEX silver derivatives during the Class Period.  Defendants consistently took positions in their trading of COMEX silver derivatives that would inure to their financial benefit. Defendants consistently profited from the artificially lower or suppressed COMEX silver derivatives prices because, throughout the Class Period, they maintained significant short positions in COMEX silver derivatives.

96.     A significant portion of Defendants' short positions in the COMEX silver derivatives were acquired through naked short selling.  That is, Defendants would contract to sell in the future silver which they did not own or had made no provisions to borrow.  Such naked short selling, unconstrained by the actual amount of silver owned or available to the short seller, enabled Defendants to more effectively suppress and manipulate silver prices during the Class Period by vastly increasing the supply of COMEX silver derivatives.

97.     Mr. Epstein in his March 25, 2010 testimony before the CFTC mentioned above, has stated that Defendants' short positions are in excess of existing world inventories.  As one prominent trader publicly testified:

> The size of the open interest in COMEX silver is irresponsibly large, given the reality of world inventories and production. Additionally, there is a significant imbalance between the largest long positions and the largest short positions, with the shorts being heavily concentrated.  In a physically delivered futures contract for a commodity of finite-supply, this also exposes the marketplace to an unnecessary risk of failure-to-deliver. Such an event could destroy the COMEX silver market.

98.     Because Defendants maintained significant naked short positions in COMEX silver derivatives, they were incentivized to keep prices depressed and roll-over their massive short positions into succeeding months.  If prices for silver increased, Defendants would be forced to cover their short positions and suffer enormous losses or deliver physical silver in quantities well in excess of what was available in the market.

### iii.    *Defendants Had the Opportunity to Conspire Through Their Participation in Trade Associations*

99.     Participation in trade associations can foster and facilitate an unlawful anticompetitive conspiracy.  Throughout the Class Period, Defendants participated in numerous trade association activities and events together, which provided many opportunities to conspire and share confidential information and trading strategies.

100.    For example, Defendants are members of the Futures Industry Association (FIA"), the Futures and Options Association ("FOA") and the London Bullion Market Association ("LBMA").

101.    HSBC USA and JPMFI are regular members of the FIA, a United States-based industry advocacy and education organization whose regular members are all futures

30

commission merchants.  In addition, the FIA's board of directors includes the managing director and global co-head of JPFMI's futures and options and OTC clearing, and Robert T. Cox, the managing director and head of futures of HSBC USA.  Richard Berliand, the chairman of JP Morgan Futures and Options and head of JP Morgan-Bear Stearns' prime brokerage business, serves as a special advisor to the board.  As part of FIA, Defendants participate in the annual Futures & Options Expo, the FIA/OIC Investor Education Day, the International Derivatives Expo, and other events and meetings.

102.    HSBC Bank PLC and JPMS are members of the FOA, an industry association for firms and institutions carrying on business in futures, options and other derivatives or which use such products in their business.  FOA's principal role is to represent the interests of its members in the public and regulatory domain and deliver a wide range of support services to the membership.  Defendants participate in annual events and conferences such as International Derivatives Week.  In addition, Richard Berliand of JPMFI serves as a special advisor to FOA's Board.

103.    Both JP Morgan Chase and HSBC NA are also members of the LBMA, the London-based trade association that represents the wholesale gold and silver bullion market in London.

    **iv.** ***Absent an Unlawful Conspiracy to Suppress and Manipulate the Price of COMEX Silver Futures and Options Contracts, Defendants' Actions Were Contrary to Their Economic Self-Interest***

104.    Each of the Defendants would have taken enormous short positions only if it knew beforehand and was confident that the other Defendant would support it and take similar short positions in the market for COMEX silver derivatives.  Given the vast sums traded, it would simply have been too risky for any one Defendant to have taken such enormous short

positions, especially with the threat that, in a fully functioning market, its principal competitor could take the adverse long position in response to the Defendants' aggressive short position. Absent their collusion, signaling and prior knowledge, it would, therefore, not have been in each of the Defendant's independent economic self-interest to have adopted the trading strategy adopted by the Defendants during the Class Period.

## FRAUDULENT CONCEALMENT

105.    By its very nature, the unlawful activity that Defendants engaged in was self-concealing. Defendants, *inter alia*, conspired and engaged in secret and surreptitious activities in order to manipulate and make artificial prices for COMEX silver futures and options contracts.

106.    Defendants fraudulently concealed their participation in their conspiracy to manipulate and make artificial the market for COMEX silver derivatives by, among other things, engaging in secret meetings and communications in furtherance of the conspiracy.  Because of such fraudulent concealment, and the fact that a conspiracy in restraint of trade is inherently self-concealing, Plaintiffs and the members of the Class could not have discovered the existence of Defendants' conspiracy and manipulation any earlier than public disclosures thereof.

107.    Defendants agreed among themselves not to discuss publicly or otherwise reveal the nature and substance of the acts and communications in furtherance of their illegal conspiracy and manipulation.

108.     Defendants communicated in secret, by telephone and e-mail, and using secret signals to conduct their anticompetitive scheme.

109.   In public proceedings, Defendants affirmatively concealed their anticompetitive scheme. The testimony of Jeremy Charles of HSBC before the CFTC on March 25, 2010, which has been described above, is one such example.

110.   Plaintiffs and members of the Class were lulled into believing that the prices at which they purchased and sold COMEX silver derivatives were the result of market conditions, rather than the product of Defendants' manipulation and collusive activities.

111.   Plaintiffs and members of the Class had no knowledge of the unlawful conduct alleged in this Complaint, or of any facts that could or would have led to the discovery thereof, until they became public in or around the time of Bart Chilton's October 26, 2010 public statement.  As noted above, Mr. Maguire was asked by the CFTC not to publicize his disclosures to the agency. Indeed, prior to that point, the CFTC had issued a "Report on Large Short Trader Activity In the Silver Futures Market" on May 13, 2008 and a May 14, 2004 letter to "Silver Investors," both of which indicated that there was no evidence that silver derivatives prices were being manipulated downward. Plaintiffs and members of the Class could reasonably rely on these official pronouncements that the silver derivatives market was operating competitively.

112.   At all relevant times and in all relevant respects, Plaintiffs and other members of the Class exercised reasonable diligence.

113.   None of the facts or information available to Plaintiffs and members of the Class prior to October 26, 2010, if investigated with reasonable diligence, could or would have led to the discovery of the conspiracy alleged in this Complaint.

114.   Because Defendants employed acts and techniques that were calculated to wrongfully conceal the existence of such illegal conduct, Plaintiffs and the Class could not have

discovered the existence of this unlawful conduct any earlier than its public disclosure in or about October 26, 2010.

115.   Because the alleged conspiracy to manipulate the price of COMEX silver derivatives was both self-concealing and affirmatively concealed by Defendants and their co-conspirators, Plaintiffs and members of the Class had no knowledge of the alleged conspiracy, did not know that the price of COMEX silver derivatives had been artificially suppressed and had no knowledge of any facts or information that would have caused a reasonably diligent person to investigate whether the conspiracies existed until October 26, 2010.

116.   As a result of Defendants' conduct and concealment of their conspiracy to manipulate COMEX silver derivatives, Plaintiffs and members of the Class were prevented from learning of the facts needed to commence suit against Defendants for the manipulative and anticompetitive conduct alleged in this Complaint until October 26, 2010.

117.   Because of Defendants' active steps, including fraudulent concealment of their conspiracy to prevent Plaintiffs and members of the Classes from suing them for the anticompetitive activities alleged in this Complaint, Defendants are equitably estopped from asserting that any otherwise applicable limitations period has run.

## COUNT 1

## VIOLATION OF COMMODITY EXCHANGE ACT, 7 U.S.C., § 1

118.   Plaintiffs incorporate by reference the preceding allegations.

119.   Plaintiffs and members of the Class purchased and/or sold COMEX silver derivatives during the Class Period at prices which were made artificial by Defendants' unlawful activities, and were injured as a result of Defendants' manipulation and suppression of silver prices.

120.     Defendants' activities constitute manipulation of the prices of COMEX silver derivatives during the Class Period in violation of Sections 9(a) and 22(a) of the CEA, 7 U.S.C. §§ 13(a), 25(a).

121.     Defendants are liable to Plaintiffs and members of the Class for the damages they sustained as a result of their CEA violations.

**COUNT 2**

**AIDING AND ABETTING VIOLATIONS OF
COMMODITY EXCHANGE ACT, 7 U.S.C. § 25**

122.     Plaintiffs incorporate by reference the preceding allegations.

123.     Defendants knowingly aided, abetted, counseled, induced, and/or procured the violations of the CEA alleged herein.  Defendants did so knowing of each other's manipulation and suppression of COMEX silver derivatives prices, and willfully intended to assist these manipulations to unlawfully cause the price of COMEX silver derivatives to be suppressed or to otherwise reach artificial levels during the Class Period, in violation of Section 22(a)(1) of the CEA, 7 U.S.C. § 25(a)(1).

124.     Defendants are liable to Plaintiffs and the Class for the damages they sustained as a result of the CEA violations.

**COUNT 3**

**VIOLATIONS OF SECTION 1 OF THE SHERMAN ACT**

125.     Plaintiffs incorporate by reference the preceding allegations.

126.     Beginning at least as early as March 16, 2008, and continuing to the present, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators engaged in a

continuing agreement, understanding, or conspiracy in restraint of trade to artificially fix, maintain, suppress, and/or stabilize the prices of COMEX silver derivatives.

127.    In formulating and effectuating the contract, combination, or conspiracy, Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to fix, maintain, suppress and otherwise make artificial the price of COMEX silver derivatives.  These activities included the following:

(a)    Defendants participated in meetings and/or conversations to unlawfully discuss the price of COMEX silver futures and options contracts;

(b)    Defendants agreed during those meetings and conversations to unlawfully sell COMEX silver derivatives in order to drive down, depress or make artificial the price of silver exchanged through those derivatives;

(c)    Defendants signaled to one another their intention to depress or otherwise make artificial the prices of COMEX silver derivatives and colluded with one another in achieving this unlawful and anticompetitive purpose; and

(d)    Pursuant to such an unlawful conspiracy in restraint of trade, Defendants knowingly and collusively traded in order to depress or otherwise make artificial the price of COMEX silver derivatives.

128.    During the Class Period, Defendants possessed market power in the market for the sale of COMEX silver futures and options contracts.

129.    Defendants' conspiracy, and resulting impact on the market for COMEX derivatives, occurred in or affected interstate and international commerce.

130.    Defendants' anticompetitive conduct had severe adverse consequences on competition in that Plaintiffs and other members of the Class who traded COMEX silver derivatives during the Class Period were trading at artificially determined prices that were suppressed as a result of Defendants' unlawful conduct.  As a consequence thereof, Plaintiffs and the Class suffered financial losses and were, therefore, injured in their business or property.

131.    As a proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have suffered injury to their business or property.

132.    Plaintiffs and members of the Class are each entitled to treble damages for the violations of the Sherman Act alleged herein.

## RELIEF SOUGHT

Accordingly, Plaintiffs demand relief as follows:

A.    That the Court determine that this action may be maintained as a class action under Rule 23(b)(3) of the Federal Rules of Civil Procedure, that Plaintiffs be appointed as class representative, and that Plaintiffs' counsel be appointed as counsel for the Class;

B.    That the unlawful conduct alleged herein be adjudged and decreed to be a violation of the CEA;

C.    That Plaintiffs and the Class recover damages, as provided under the CEA, together with prejudgment interest;

D.    That the unlawful conduct alleged herein be adjudged and decreed to be an unlawful restraint of trade in violation of Section 1 of the Sherman Act;

E.    That Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees and all other persons

37

acting or claiming to act on their behalf, be permanently enjoined and restrained from continuing and maintaining the conspiracy alleged in the Complaint;

F.      That Plaintiffs and the Class recover damages, as provided under federal antitrust laws, and that a joint and several judgment in favor of Plaintiffs and the Class be entered against Defendants in an amount to be trebled in accordance with such laws;

G.      That Plaintiffs and the Class recover their costs of the suit, including attorneys' fees, as provided by law; and

H.      That the Court direct such further relief it may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial as to all issues triable by a jury.


Dated:  November 15, 2010                    Respectfully submitted,


                                             Steig D. Olson
                                             **HAUSFELD LLP**
                                             11 Broadway, Suite 615
                                             New York, NY 10004
                                             Telephone: 212.830.9850
                                             Fax: 212.480.8560
                                             solson@hausfeldllp.com

                                             Michael D. Hausfeld
                                             William P. Butterfield
                                             Michael P. Lehmann
                                             Ralph J. Bunche
                                             **HAUSFELD LLP**
                                             1700 K St NW, Suite 650
                                             Washington, DC 20006
                                             Telephone: 202.540.7200
                                             Fax: 202.540.7201

38

mhausfeld@hausfeldllp.com
wbutterfield@hausfeldllp.com
mlehmann@hausfeldllp.com
rbunche@hausfeldllp.com

Allan Steyer
**STEYER LOWENTHAL BOODROOKAS
ALVAREZ & SMITH LLP**
One California Street, Third Floor
San Francisco, CA 94111
Telephone: 415.421.3400
Fax:  415.421.2234
asteyer@steyerlaw.com

*Counsel for Plaintiffs and the Proposed Class*